**ESSEX CHEMICAL CORP. and Essex Specialty Products, Inc., Plaintiffs,**

v.

**HARTFORD ACCIDENT AND INDEMNITY CO., et al., Defendants.**

**Civil Action No. 93–3438(JCL).**

United States District Court, D. New Jersey.

Jan. 28, 1998.

David A. Thomas, Lowenstein, Sandler, et al, Roseland, NJ, for Essex Chemical Corporation.

Robert F. Walsh, Neil L. Sambursky, Grace. C. Guiffrida, Melito & Adolfsen, Jersey City, NJ, for Hartford Accident & In-demnity Company & Twin City Fire Insurance Company.

Stephen D. Cuyler, Cuyler, Burk, Parsippany, NJ, for Northbrook Insurance Company.

E. Douglas Sederholm, White & Williams, Philadelphia, PA, for Century Indemnity Company, as successor to Insurance Company of North America.

Antonio D. Favetta, Garrity, Graham & Favetta, Montclair, NJ, for Lexington Insurance Company.

## OPINION

LIFLAND, District Judge.

Defendants Hartford Accident and Indemnity Co., Twin City Fire Insurance Co., Century Indemnity Co., Westport Insurance Co., Lexington Insurance Co. and Northbrook Insurance Co. (hereinafter collectively the "defendants") appeal from the Magistrate Judge's Order of May 23, 1997 granting plaintiff's motion for disqualification of all defense counsel. The instant appeal requires the Court to consider the propriety of disqualifying all counsel for all members of a joint defense consortium where a firm representing one member has previously represented a now-adverse party in a substantially related matter. For the reasons set forth herein, the Magistrate Judge's disqualification order will be reversed and the matter remanded for further proceedings.

## BACKGROUND

On August 3, 1993, plaintiffs Essex Chemical Corp. and Essex Specialty Products, Inc. (hereinafter "Essex" or the "plaintiff") commenced this litigation seeking a declaration of insurance coverage with respect to certain environmental claims arising from contamination at Essex facilities.[1] The following events form the basis of the instant dispute.

In May of 1988, a joint venture partner of Essex attempted a hostile takeover of Essex. From the time of the takeover attempt in May until October of that same year when Dow Chemical Company (hereinafter "Dow")

1. Though Essex originally named Hartford as the sole defendant, Essex amended its complaint in June 1994 to include the additional named defendant insurers.

acquired Essex, Essex was represented by Skadden, Arps, Slate, Meagher and Flom (hereinafter "Skadden") in all takeover and acquisition negotiations. Thereafter, Skadden also represented Essex in litigation arising from the takeover attempt (hereinafter the "1988 litigation"). During the course of its representation and to effectively carry it out, Skadden became knowledgeable in nearly every aspect of Essex's affairs and became fully familiar with the company, its assets, and its liabilities. Skadden participated in efforts aimed at attracting potential buyers and in "white knight shows" aimed at informing potential purchasers of the environmental status, including potential liabilities, at Essex sites. Skadden had access to numerous Essex documents relating to all aspects of Essex's business and worked closely with Essex personnel and advisors, including Essex's in-house counsel and investment banker.

In the instant declaratory judgment action, Skadden was retained as counsel by defendant The Home Insurance Company (hereinafter "Home"), one of Essex's primary insurers. In 1996, defendants executed an ECC Coverage Litigation Joint Defense and Cost Sharing Agreement (hereinafter the "Joint Defense Agreement") which, defendants maintain, was created for the purpose of managing and expediting the litigation in an orderly and cost effective manner through coordination of discovery and other activities of common concern. During the course of discovery, defendants deposed former Essex employees involved in the takeover attempt, in the white knight shows and in Dow's 1988 acquisition regarding those events as well as the environmental disclosures which were made during the course of the acquisition.

On January 24, 1997, during a deposition of Deirdre Farley, former Essex in-house counsel, Essex learned of Skadden's former representation of Essex in the takeover matter and in litigation stemming therefrom. Subsequently, Essex also learned that Timothy Reynolds, Esq., the Skadden partner in charge of Home's representation in the present matter, had personally represented Essex in a products liability action. On February 28, 1997, Essex filed a motion to disqualify Skadden based on an alleged conflict of interest. Essex also sought an order disqualifying the remaining five defense firms alleging that their representation was tainted by virtue of Skadden's participation in the joint defense arrangement. By letter to Essex dated April 8, 1997, Skadden voluntarily withdrew as counsel for Home. On May 23, 1997, without a hearing on the disqualification motion,[2] the Magistrate Judge filed a written Opinion and Order granting Essex's motion as to all defense counsel.

### The Opinion of the Magistrate Judge

The Magistrate Judge granted Essex's motion to disqualify all defense counsel. The Magistrate Judge ruled that Skadden's disqualification was compelled by New Jersey Rule of Professional Conduct 1.9(a)(1) based on a finding that Skadden's prior representation of Essex concerned matters substantially similar to the present action.

The Magistrate Judge further found that disqualification of the remaining defense counsel was compelled by their participation in the joint defense group. Specifically, the Magistrate Judge found that Skadden's participation in the joint defense group created a risk that the confidential information acquired by Skadden during the former representation may be used to the detriment of Essex. The Magistrate Judge stated: "I presume that such confidential and privileged information has been shared between all participants to the Joint Defense Agreement, despite defense counsel's certifications to the contrary." The Magistrate Judge therefore concluded that allowing defense counsel to remain posed indirectly the same risk that Skadden's representation posed directly.

Though defendants refused Essex's discovery requests to produce the Joint Defense

---

**2.** Though the opinion of the Magistrate–Judge states, "I heard oral argument on April 28, 1997", Opinion of May 23, 1997, at 1, it is clear from the record that the Magistrate–Judge did not entertain oral argument on the motion to disqualify. *See* Transcript of April 28, 1997, at 21 (hearing oral argument on motions to amend and consolidate but declining to hear argument on the disqualification motion and informing the parties that a written opinion would be forthcoming).

Agreement, the Magistrate Judge further concluded, without seeing the agreement, that defendants' participation in the Joint Defense Agreement, together with Skadden's former representation of Essex, gave rise to an implied attorney-client relationship between Essex and all defense counsel, thus obviating the need for any showing that defense counsel actually received confidential information from Skadden. The Magistrate Judge declined to conduct a hearing to determine whether Skadden had divulged confidential information to the other defense counsel, stating that such a hearing would require defense counsel to disclose the content and extent of communications shared under the Joint Defense Agreement and would therefore implicate the joint defense privilege. Finding that the joint defense privilege applied to communications arising under the Joint Defense Agreement, the Magistrate ruled that defense counsel's assertion of the privilege prohibited them from rebutting the presumption of shared confidences.

Lastly, the Magistrate Judge found that disqualification of all defense counsel was also mandated by the Rules of Professional Conduct forbidding representation which creates an appearance of impropriety. Specifically, the Magistrate Judge found that an ordinary and knowledgeable citizen acquainted with the facts of this case would conclude that continued representation by all defense counsel poses a substantial risk of disservice to either the public interest or to defendants. The Magistrate Judge further found that by virtue of the Joint Defense Agreement, defense counsel were in a position to have access to confidences regarding Essex, which relationship creates an appearance of impropriety and therefore compels disqualification of all defense counsel.

## STANDARD OF REVIEW

■ A district court may reverse a Magistrate Judge's order only where it finds the

ruling clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); *Fed.R.Civ.P.* 72(a); *L.Civ.R.* 72.1(c)(1)(A). A ruling is clearly erroneous where, although there is evidence to support it, the district court upon review of the entire evidence is left with the "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

## THE PARTIES' ARGUMENTS ON APPEAL

On appeal,[3] defendants argue that the Magistrate Judge's Order is contrary to law in that it: wrongly created an irrebuttable presumption that confidences acquired by Skadden were shared among the defense group; wrongly concluded that an implied attorney-client relationship existed between Essex and all defense counsel; applied the incorrect standard for determining whether an appearance of impropriety exists; and failed to weigh the need for disqualification against hardship to the clients and the clients' right to counsel of choice. Defendants also argue that the Magistrate Judge's order is clearly erroneous in that: the conclusion of shared confidences among defense counsel is wholly unsubstantiated by the record; the evidence in the record supports the conclusion that the defense counsel group holds no confidences of Essex; and the Magistrate Judge's failure to conduct a hearing to determine what, if any, confidential information was shared among Essex, Skadden and other defense counsel was based on a misinterpretation of defendants' assertion of the joint defense privilege.

## DISCUSSION

### Legal Authorities

■ Pursuant to Local Rule 6A of the United States District Court for the District

---

**3.** On June 2, 1997, the Magistrate–Judge entered an order staying the instant action pending appeal. Notices of appeal were filed separately by the various defendants between June 1997 and June 9, 1997. Defendants Hartford, Twin City, Century and Lexington submitted a joint memorandum of law in support of their appeal. Defendant Northbrook submitted a separate memorandum in support of appeal. Though defendants have submitted separate briefs, they advance essentially the same arguments on appeal. Defendant Northbrook also submitted an Affidavit of Timothy G. Reynolds, Esq., a Skadden attorney. The Court will not consider the affidavit as it is not part of the record on appeal.

of New Jersey, the New Jersey Rules of Professional Conduct (hereinafter "RPC") govern the conduct of attorneys admitted to practice before this Court. *See* L.Civ.R. 6A. In construing the RPC, a district court may look to the decisions of the New Jersey Supreme Court and other relevant authority. *See id.; Carlyle Towers Condominium Ass'n v. Crossland Sav.*, 944 F.Supp. 341, 344–45 (D.N.J.1996); *Host Marriott Corp. v. Fast Food Operators, Inc.*, 891 F.Supp. 1002, 1006–07 (D.N.J.1995). Because the instant matter concerns alleged ethical violations by attorneys, this Court looks to the RPC and relevant case law in ruling on defendants' appeal of the Magistrate Judge's disqualification order.

■ Motions to disqualify are viewed with disfavor as disqualification is a drastic remedy with often far-reaching, sometimes devastating implications. *Carlyle Towers*, 944 F.Supp. at 345; *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1114 (D.N.J.1993). Although doubts are to be resolved in favor of disqualification, a party seeking to disqualify counsel carries a heavy burden and must satisfy a high standard of proof. *Carlyle Towers*, 944 F.Supp. at 345; *Alexander*, 822 F.Supp. at 1114.

*Disqualification Under RPC 1.9(a)(1)*

■ RPC 1.9(a)(1) governing successive representation provides:

(a) A lawyer who has represented a client in a matter shall not thereafter:

(1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client ...

RPC 1.9(a)(1). The New Jersey Supreme Court employs a "substantial relationship" test for determining whether disqualification is warranted under RPC 1.9(a)(1). Under that test, a movant must prove: (1) the existence of a past attorney-client relationship

between the movant and the attorney sought to be disqualified; (2) that the interests of the attorney's current client are materially adverse to those of the movant; and (3) the current representation involves the same or a matter substantially related to the former representation. *Host Marriott*, 891 F.Supp. at 1007. Where the moving party has established that the matters are substantially related, the court will presume that the attorney has acquired confidential information from the former client. *Reardon v. Marlayne, Inc.*, 83 N.J. 460, 473, 416 A.2d 852 (1980); *Herbert v. Haytaian*, 292 N.J.Super. 426, 438, 678 A.2d 1183, 1189 (App.Div.1996). Such a presumption is irrebuttable and thus disqualification will be compelled. *Reardon*, 83 N.J. at 473, 416 A.2d 852; *Herbert*, 292 N.J.Super. at 438, 678 A.2d at 1189. Because knowledge of such confidences will also be imputed to all members of that attorney's firm, disqualification of the entire firm is equally compelled. *See* RPC 1.10(a) (employing per se rule of disqualification of all attorneys currently practicing in same firm without regard to actual sharing of confidences); GEOFFREY C. HAZARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING § 1.10:200, at 324–25 (1996).

The law governing imputation of knowledge and disqualification is decidedly less clear where, as here, a party seeks to disqualify all counsel for all members of a joint defense consortium where a firm representing one member has previously represented a now-adverse party in a substantially related matter.[4] The parties have not cited, and the Court's research has not yielded, any controlling or even persuasive authority directly on point. In the absence of such authority, the Court looks to an American Bar Association ethics opinion and to case law on disqualification in two multiple-party contexts: representation by co-counsel and representation by side-switching attorneys who have changed firms.

In a formal ethics opinion, the American Bar Association Committee on Ethics and Professional Responsibility addressed the ob-

---

4. Defendants do not challenge the Magistrate Judge's finding that the 1988 litigation and the current environmental litigation are substantially related. *See* Opinion and Order of May 23, 1997, at 8–9.

ligations of a lawyer who represented a client who was a member of a joint defense consortium, subsequently changed firms, and was asked to file suit against other members of the consortium in a matter related to the former representation. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 395 (1995). The Committee opined that to the extent the attorney had received confidential information regarding other members of the defense consortium, the attorney might owe an obligation to his former client not to disclose such confidences, based on the client's obligation to the other members. As to whether the attorney had any direct obligation to other consortium members who, by virtue of the terms of the defense consortium agreement were not his clients, but from whom the attorney had received confidences, the Committee stated: "Lawyer would almost surely have a fiduciary obligation to the other members of the consortium, which might well lead to his disqualification." *Id.* In opining that the attorney would "almost surely" have a fiduciary obligation, the ABA did not state whether under the RPC's the attorney bore any ethical obligation to the other consortium members.

In *Akerly v. Red Barn System,* 551 F.2d 539 (3d Cir.1977), the Court of Appeals for the Third Circuit considered disqualification of plaintiff's lead counsel and co-counsel where co-counsel had previously been employed by a firm that represented a corporation related to the defendants. In upholding the district court's disqualification of co-counsel and refusal to disqualify lead counsel, the court rejected defendants' request to adopt a per se rule that if one co-counsel is disqualified for ethical violations, all co-counsel must be similarly disqualified. *Akerly,* 551 F.2d at 543. The court emphasized the need for a careful analysis of all facts and circumstances surrounding the controversy. *Id.* The court further emphasized the district court's specific finding, after extensive hearings, that co-counsel was not a conduit of confidential information to lead counsel. *Id.* at 542, 544. Stressing co-counsel's peripheral role, the fact that the relationship between counsel was not an active one, and the district court's finding regarding the impossibility of shared confidences, the Third Circuit held that the district court did not abuse its discretion in declining to disqualify lead counsel. *Id.*

In *Realco Services, Inc. v. Holt,* 479 F.Supp. 867 (E.D.Pa.1979), the District Court for the Eastern District of Pennsylvania considered defendants' motion to disqualify plaintiff's lead and local co-counsel. The court granted the motion to disqualify lead counsel because a member of lead counsel's firm had previously represented some of the defendants in litigation involving the same issue. *Realco,* 479 F.Supp. at 878. With regard to co-counsel, the court, citing *Akerly,* emphasized the need to perform a careful sifting of all facts and circumstances where a party seeks to disqualify an attorney who has not previously represented a currently adverse interest. *Id.* at 878–79 (citing *Akerly,* 551 F.2d at 543). Because a court is able to investigate the working relationship between lead and co-counsel without running a significant risk of exposing client confidences, a court should first find a reasonable likelihood of actual prejudice to a client's confidences before ordering disqualification. *Id.* at 879. The court declined to employ a rule of double imputation that would impute knowledge of confidences from one member of the lead firm to all members of that firm, and would then impute that same knowledge to co-counsel, noting that such an approach could lead to extreme results. *Id.* at 878 ("The defendants' argument for disqualification ... rests on an intricate chain of possibilities.... Obviously at some point the chain of possibilities bears little resemblance to reality."). Considering co-counsel's affidavit explaining his role in the litigation and noting that defendants failed to submit any evidence that co-counsel had actually reviewed any documents in the possession of lead counsel, the court found that co-counsel had not been privy to any confidences of defendants. *Id.* at 879. Accordingly, the court denied defendants' motion to disqualify co-counsel. *Id.* at 880.

In *American Can Co. v. Citrus Feed Co.,* 436 F.2d 1125 (5th Cir.) *reh'g denied* (March 4, 1971), the Court of Appeals for the Fifth Circuit reviewed the district court's order granting defendants' motion to disqualify

plaintiff's attorneys. Defendants sought to disqualify an attorney who had previously represented defendants in an allegedly related matter, a partner of that attorney and an attorney in a second firm with whom the partner had consulted. *See American Can,* 436 F.2d at 1126–27. Following the district court's hearing, the attorney from the first firm and his partner withdrew from representation. *Id.* at 1127. Addressing the district court's disqualification of the attorney from the second firm, the Court of Appeals noted that the second firm acted as co-counsel to the first firm. *Id.* at 1129. The Court of Appeals held that although imputation of knowledge is appropriate among all attorneys associated in the first firm, re-imputation of that knowledge to the attorney acting as co-counsel would be inappropriate where co-counsel was neither employed by nor in a partnership arrangement with the first firm. *Id.* The court of appeals refused to employ a double imputation theory, stressing that

> [c]arriage of this imputation-on-an-imputation to its logical terminus could lead to extreme results in no way required to maintain public confidence in the law. . . . Such a rule would be unsound logically and indefensible practically. When considerations of wasted time and unnecessary expense are added to the weight against the rule, it becomes clear that so rigid a commandment has no place in the legal realm.

*Id.* The Court of Appeals ultimately reversed the district court's disqualification order, noting the district court's failure to make necessary fact findings and the defendants' failure to prove: (1) an attorney-client relationship with the second firm and (2) a substantial relationship between confidential disclosures made to the attorney in the first firm and the subject of the current litigation. *Id.* at 1130.

In *Brennan's Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168 (5th Cir.1979), the Court of Appeals for the Fifth Circuit considered plaintiff's motion to disqualify defendants' attorneys in a trademark infringement action. One of defendant's attorneys had been retained by another of defendant's attorneys, who had previously served as general counsel to the Brennan family businesses at a time when all the members of the Bren-

nan family were stockholders and directors of plaintiff, and some members were stockholders and directors of defendant. The Fifth Circuit affirmed the district court's disqualification of the attorney who had previously represented plaintiff and defendant, noting that the district court's finding of prior representation and substantial relationship were not disputed. *Id.* at 172.

Addressing the disqualification of the attorney who had not previously represented plaintiff, the Court of Appeals rejected the district court's imputation of knowledge from the former attorney to the retained attorney, noting that the retained attorney never had an attorney-client relationship with the plaintiff. *Id.* at 173. The court further noted that, although it had accepted defendants' undisputed assertion that defendants and plaintiff were previously joint clients of the disqualified attorney, the district court made no findings as to whether the disqualified attorney represented the parties jointly, or only plaintiff, with respect to the precise issue in the present litigation. The court stressed that the propriety of disqualification turned on "this fact and others not found by the court below." *Id.* The court therefore vacated that part of the district court order disqualifying the retained attorney and remanded for further proceedings. *Id.* The court instructed that if the district court finds that the disqualified counsel jointly represented the parties in matters involving the precise subject of the current litigation, disqualification of the retained attorney in the current litigation would be unwarranted because there are no confidences between joint clients and thus nothing to impute. *Id.* The court also noted, however, that if the district court finds that the disqualified counsel did not jointly represent the parties in such matters, disqualification of the retained attorney is not automatic. *Id.* at 174. Rejecting a per se rule of disqualification of co-counsel, the court explained that in the absence of a previous attorney-client relationship between the client and co-counsel, "a presumption of disclosure of confidences is inappropriate. [The attorney] should not be disqualified unless he has learned from [disqualified counsel] information the plaintiff had intended not be disclosed to the defendants." *Id.*

In *Smith v. Whatcott*, 774 F.2d 1032 (10th Cir.1985), the Court of Appeals for the Tenth Circuit considered plaintiff's motion to disqualify defendants' trial counsel from serving as counsel on appeal where first appellate counsel had been disqualified and trial counsel was listed as co-counsel on all papers filed by disqualified appellate counsel. The court rejected plaintiff's invitation to extend to trial counsel the presumption of shared confidences that was employed to disqualify original appellate counsel. *Id.* at 1035. The court distinguished between imputation based on actual conflict and imputation based on imputed conflict. *Id.* at 1034–35 (citing cases). The court found it unreasonable to re-impute knowledge of confidences to co-counsel who had no access to files and limited contact with an attorney whose knowledge of confidences was not actual but rather imputed from an associated attorney. *Id.* at 1035. Accordingly, the Tenth Circuit denied plaintiff's disqualification motion.

In *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564 (Fed.Cir.1984), the Court of Appeals for the Federal Circuit, applying Seventh Circuit law, reviewed the district court's ruling on plaintiff's motion to disqualify defendant's attorney and his firm based on an alleged conflict of interest created by the merger of two firms, where the attorney sought to be disqualified had worked for another firm that previously represented plaintiff. Relying on the Fifth Circuit's decision in *American Can*, the court noted the impropriety of granting disqualification based on multiple presumptions. *Id.* at 1578. The court instructed that where knowledge is not actual but imputed based on the presumption that members of a firm share confidences, subsequent re-imputation of that same knowledge to another attorney and a firm with which he becomes associated is inappropriate. *Id.* at 1579. Explaining the role and effect of presumptions in the disqualification context, the court stated:

> The effect of a presumption of fact, here the fact of shared confidences, is to place upon the opposing party the burden of establishing the nonexistence of that fact. The burden on the opposing party, however, is limited to production of evidence. The burden of persuasion on the existence

of the presumed fact remains throughout on the party invoking the presumption. The movant for disqualification, as on any other motion, bears the ultimate burden.

A presumption does not enjoy the status of evidence. If a finding on the evidence is made that a presumed fact has been effectively rebutted, the presumed fact ceases to exist.... If evidence is provided which falls short of meeting the threshold of rebuttal, the presumed fact retains its viability. Hence, the standard to establish the nonexistence of the presumed fact may be critical.

Under Seventh Circuit law, to rebut a presumption of shared confidences within a firm, the district court is required to find:

> [W]hether the knowledge of the "confidences and secrets" of [the Client of the first firm] which [the attorney] brought with him has been passed on to or is likely to be passed on to the members of the [second] firm.

An absolute finding of no possible inadvertent sharing of confidences is not required to establish an effective rebuttal. The proof of a negative renders certainty virtually impossible.... [T]he standard is likelihood, not certainty, and all of the circumstances must be weighed in determining such likelihood.

*Id.* at 1579, 1580 (quotation omitted). The *Panduit* court vacated the district court's order disqualifying the attorney and remanded the case, noting that the district court had applied an incorrect legal presumption against him. *Id.* at 1581. The court reversed the district court's order disqualifying the attorney's firm, noting that the presumption of shared confidences was definitively overcome. *Id.* at 1582.

In *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir.1977), the Court of Appeals for the Second Circuit reversed the district court's denial of a defendant's motion to disqualify plaintiff's local co-counsel where co-counsel had been retained by plaintiff's regional counsel who had himself previously represented defendant. The court stressed the close working relationship between the two firms and the significant

role of the regional counsel in hiring co-counsel. *Id.* at 235–36. The court held that in triangular relationships, the substantial relationship test requires a court to ascertain whether the attorney sought to be disqualified was in a position to receive client confidences. *Id.* at 235 (citing Second Circuit cases for the same proposition). The *Funds* court found that co-counsel was in such a position given the intimate working relationship with regional counsel. *Id.* at 236. The court expressly rejected plaintiff's argument that imputation of the confidences acquired by regional counsel to co-counsel threatened an endless chain of disqualifying imputation. *Id.* at 235 n. 21. The circuit court reversed the district court's order refusing to disqualify co-counsel, finding the general rule that a co-counsel relationship alone does not warrant disqualification irrelevant given the extraordinary sui generis facts of that case. *Id.* at 235.

In *Dewey v. R.J. Reynolds Tobacco Co.,* 109 N.J. 201, 536 A.2d 243 (1988), the New Jersey Supreme Court, reviewing the Appellate Division's disqualification of a side-switching attorney and his new law firm, disqualified the attorney based on the attorney's former representation of defendant but declined to disqualify the attorney's new firm. The Supreme Court instructed that where an attorney has previously represented a client on substantially related matters, then joins a new law firm, the attorney and all members of the new firm are disqualified based on imputation of shared confidences.

*Id.* at 221–22, 536 A.2d 243 (citing RPC 1.9; 1.10(a)). However, where a side-switching attorney has not himself represented the former client, a court must first determine whether the attorney acquired actual material confidences. *Id.* at 222, 536 A.2d 243. The attorney sought to be disqualified bears the burden of proving no confidences have been acquired. *Id.* Lastly, the Supreme Court emphasized that a court should ordinarily decide the matter on the papers and that a hearing should only be held where gaps in the facts or questions of witness credibility so necessitate. *Id.* The court cautioned that the risk of revealing secrets renders inquiry into the attorney's actual receipt of confidences a method of last resort. *Id.* at 222–23, 536 A.2d 243.[5]

### Application of Legal Authorities

Defendants argue that the Magistrate Judge improperly relieved Essex of its heavy burden of proof under RPC 1.9(a)(1) by applying an improper legal standard to Essex's motion to disqualify all defense counsel. Specifically, defendants contend that where an attorney has not actually represented a now-adverse party but was employed by a firm that did, the determinative question is whether the attorney actually received confidential information; in the absence of a direct attorney-client relationship between the attorney and the now-adverse client, there is no presumption of shared confidences, and the Magistrate Judge's reliance on an over-

---

**5.** As *Dewey* reflects, the RPCs embody very distinct imputation rules where a side-switching attorney moves from one firm to another. In that instance, a moving attorney who did not actually serve the client in question is deemed to carry only those confidences actually received and any potential taint to the new firm must be ascertained accordingly. *See Dewey,* 109 N.J. at 223, 536 A.2d 243 (instructing that where attorney sought to be disqualified did not actually represent the former client, the court must determine whether attorney has acquired material information, and burden is on attorney to show that no protected information has been acquired); *see also* HAZARD & HODES, THE LAW OF LAWYERING §§ 1.10:207–08, at 334–3 (explaining the combined effect of Model Rules 1.9 and 1.10(a) which mirror the RPCs in the relevant provisions); *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751 (2d Cir.1975) (refusing to disqualify, second firm based on associa-tion of new attorney where associate had no specific factual knowledge about client). *But see Cheng v. GAF Corp.,* 631 F.2d 1052 (2d Cir.), *vacated on other grounds,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981) (disqualifying attorney and new firm where attorney had previously been employed by firm representing adversary, upholding district court's assumption that attorney had been privy to client confidences, noting the district court's finding that no actual confidences had been relayed to new firm but disqualifying firm based on its failure to demonstrate screening procedures which could prevent disclosure); *NCK Org. Ltd. v. Bregman,* 542 F.2d 128 (2d Cir.1976) (holding that neither actual possession of confidences nor disclosure of same by side-switching attorney to new firm was required and that presumption of shared confidences between attorney and new firm was appropriate given some evidence of the possibility that disclosures were made in the past).

ruled decision to justify application of an irrebuttable presumption of shared confidences between Skadden and all defense counsel was contrary to law. Defendants also argue that the Magistrate Judge's finding of an attorney-client relationship between Essex and all defense counsel to bolster the use of an irrebuttable presumption was clear error. Defendants further argue that the record contains ample evidence establishing that the defense group did not actually acquire Essex confidences from Skadden. Lastly, defendants contend that the Magistrate Judge should have conducted a hearing to determine what, if any, information was shared between Skadden and other defense counsel, and that the failure to do so was legal error and based on a misinterpretation of defense counsel's assertion of the joint defense privilege.

Plaintiff urges the Court to uphold the Magistrate Judge's application of the irrebuttable presumption standard. Plaintiff argues that although the Magistrate Judge's reasoning was founded on overruled and non-controlling case law, the same reasoning has been employed by other courts. Plaintiff further argues that the joint defense arrangement in the instant matter presents an even more compelling case for disqualification than the fact scenarios before the other courts.

■ The Court finds that the Magistrate Judge's application of an irrebuttable presumption of shared confidences among Skadden and all defense counsel was improper. In applying an irrebuttable presumption that confidences acquired by Skadden were relayed to all defense counsel, the Magistrate Judge rejected defendants' argument that in the absence of a direct attorney-client relationship, a showing that confidences were actually received must be made to impute knowledge sufficient to warrant disqualification. Instead, relying on the overruled decision in *Putnam Resources, L.P. v. Sammartino*, 124 F.R.D. 530 (D.R.I. 1988) [6], the Magistrate Judge presumed that

confidences had been relayed from Skadden to other defense counsel. In effect, the Magistrate Judge applied an irrebuttable presumption of shared confidences between Skadden and all defense counsel, making a double imputation of knowledge: first from the Skadden attorneys involved in the 1988 litigation to all Skadden attorneys, then from Skadden to all defense counsel. In so ruling, the Magistrate Judge refused to consider defendants' certifications stating that no Essex confidences had been relayed from Skadden to other defense counsel, declared that defendants' invocation of the joint defense privilege would render rebuttal impossible and deemed any showing of shared confidences unnecessary based on his finding that the Joint Defense Agreement created an implied attorney-client relationship between Essex and each member of the defense counsel group.

### *Double Imputation*

■ Numerous courts, including the Third Circuit in *Akerly*, the District Court for the Eastern District of Pennsylvania in *Realco*, the Fifth Circuit in *American Can* and *Brennan's*, the Tenth Circuit in *Smith*, the Federal Circuit in *Panduit*, and the New Jersey Supreme Court in *Dewey* have rejected a per se rule of double imputation. As those authorities explained, under a per se rule of double imputation, knowledge acquired by one attorney is imputed to all attorneys associated in his firm; that same knowledge is then re-imputed to any attorney in a second firm with whom any member of the first firm becomes associated, based on multiple irrebuttable presumptions that members of the respective firms have shared client confidences. In rejecting such a rule, those courts categorically stressed the potentially harsh results that imputation based on imputed conflict might cause. Those courts also uniformly emphasized the need for a careful review of the facts to determine: (1) what, if any, confidences were actually

---

**6.** In *Putnam Resources*, the Magistrate Judge granted defendants' motion to disqualify plaintiff's counsel and co-counsel based on a conflict of interest. *See id.* at 533. On appeal, the Chief District Judge, without opinion, affirmed the

Magistrate Judge's order disqualifying lead counsel, but reversed the Magistrate Judge's order disqualifying co-counsel. *See id.* (Order of District Court appended to Magistrate Judge's Order).

shared between the tainted attorney and the attorney sought to be disqualified, where the tainted attorney did not represent the former client in question and (2) the nature of the relationship between the tainted attorney and the attorney sought to be disqualified.

That rejection of a per se rule of double imputation has generally occurred in the co-counsel context or in the context of a firm-switching attorney does not render its rejection any less applicable to cases, such as the instant one, involving a side-switching firm who represents a member of a joint defense consortium. *See Reardon,* 83 N.J. at 474, 416 A.2d 852 ("Labels such as partner, associate, clerk, co-counsel should not control the outcome of decisions in this sensitive area."). Where, as here, parties have engaged in a joint defense arrangement, the reasons for rejecting the double imputation theory may be even more compelling because each member of the consortium is represented by its own counsel in pursuit of its own interests, which may often be adverse to those of other members. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 395.

■ This Court agrees with the reasoning of the courts in *Akerly; American Can, Realco, Smith, Brennan's* and *Panduit* and holds, therefore, that where knowledge is not actual, but imputed based on the presumption that members of a firm share confidences, automatic re-imputation of that same knowledge to another attorney with whom the vicariously disqualified attorney collaborated is unreasonable. The common thread among the cited authorities is their requirement of a painstaking factual analysis before disqualifying an attorney given the risk of interminable disqualification posed by an imputation-on-imputation rule. Such an analysis requires the trial court to ascertain the material facts in a manner consistent with effectuating any legitimately claimed privilege. The Magistrate Judge's efforts here fell short of what is appropriate.

On remand, defense counsel must be afforded the opportunity to establish: (1) that they did not acquire any confidential information from Skadden's counsel and (2) the precise nature of the relationship among all defense counsel. While *Dewey* holds that the risk of revealing client confidences makes a hearing a method of last resort, the Court finds gaps in the record which necessitate a hearing. A hearing will permit the Court to investigate the working relationship among defense counsel to determine what direct or implied attorney-client or fiduciary obligations were owed among defense counsel and defendants, and what, if any, confidences were shared between Skadden and the other defense counsel. Essential to that investigation is an examination of the provisions of the Joint Defense Agreement, which defendants have not submitted, and which will define and outline the relationship and obligations among the members of the defense consortium.

In so holding, the Court rejects the minority position adopted by the Second Circuit in *Funds* which, in addition to running contrary to the weight of persuasive authority, distinguished its facts from *American Can* and cautioned that its decision rested on the extreme facts of that case. Accordingly, the Court finds that in applying an irrebuttable presumption of shared confidences between Skadden and all defense counsel, the Magistrate Judge made a double imputation of knowledge: first from the Skadden attorneys involved in the 1988 litigation to all Skadden attorneys, then from Skadden to all defense counsel. Such imputation-on-imputation and refusal to consider defendants' certifications was contrary to law.

■ The Court further finds that the Magistrate Judge was clearly erroneous in declaring that defendants' assertion of the joint defense privilege rendered rebuttal impossible. The record is clear that although defendants had asserted the privilege with regard to certain of Essex's discovery requests, defendants categorically denied receiving any confidential information from Skadden and were prepared to address Skadden's role in the defense consortium and their contacts with Skadden in the instant litigation. *See, e.g.,* Certification of Robert E. Walsh, at ¶ 7; Certification of Neil L. Sambursky, at ¶ 2, 4; Certification of E. Douglas Sederholm, at ¶¶ 2–3; Certification of John J. Lawson, at ¶¶ 2–3; Certification of

Francis J. Phillips, at ¶ 5; Affidavit of Stephen D. Cuyler, at ¶ 4.

### Implied Attorney–Client Relationship

 The Court also finds that the Magistrate Judge erred in determining that the Joint Defense Agreement gave rise to an implied attorney-client relationship between Essex and all counsel for all members of the joint defense group. Such a finding is contrary to law and unsupported by the record. *See Ageloff v. Noranda,* 936 F.Supp. 72, 76 (D.R.I.1996) (holding that implied attorney-client relationship requires more than subjective belief that person with whom an individual is dealing has become his lawyer; rather, belief must be objectively reasonable under the totality of the circumstances, which includes consideration of factors such as intent of alleged client and attorney and payment arrangements). As noted, the record does not contain a copy of the Joint Defense Agreement or any of its provisions which would reveal defendants' and counsel's intent, the extent and nature of counsel's interaction, and any other considerations relevant to the implied attorney-client relationship analysis. Moreover, none of the authorities on which the Magistrate Judge relied stands for the proposition that a collaborative counsel relationship renders a participating attorney implied counsel for the former client of a collaborating attorney. *See id.* (addressing whether counsel for one member of joint defense group is implied attorney for other, separately represented current member); *United States v. McPartlin,* 595 F.2d 1321, 1337 (7th Cir.1979) (addressing relationship of codefendants in the criminal context); *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.,* 559 F.2d 250, 253 (5th Cir.1977) (same).

Accordingly, for the foregoing reasons. that part of the Magistrate Judge's order disqualifying defense counsel under RPC 1.9(a) will be reversed.

### Appearance of Impropriety

 Under New Jersey law, the appearance of impropriety doctrine is codified at RPC 1.9(b), which incorporates by reference RPC 1.7(c) as to successive representa-

tion problems. *See* RPC 1.9(b), 1.7(c); *Carlyle Towers,* 944 F.Supp. at 352. RPC 1.9(b)(2) specifically authorizes disqualification in certain cases creating an appearance of impropriety even where no actual conflict exists. RPC 1.9(b)(2) provides:

> [I]n certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.

New Jersey federal and state courts have consistently held that the appearance of impropriety doctrine is intended not to prevent any actual conflicts, but rather to "bolster the public's confidence in the integrity of the legal profession." *Steel,* 912 F.Supp. at 740 (quoting *In re Advisory Opinion on Prof. Ethics No. 569,* 103 N.J. 325, 330, 511 A.2d 119 (1986)). Thus, whether an appearance of impropriety exists must be determined from the viewpoint of informed and concerned citizens. *Reardon,* 83 N.J. at 473, 416 A.2d 852; *Steel,* 912 F.Supp. at 740. Essentially, the analysis requires a careful examination of all relevant facts and circumstances to ascertain what a reasonable person would find proper or improper, and whether any legitimate purpose would be served by disqualification. *Reardon,* 83 N.J. at 473, 416 A.2d 852 ("The likelihood of public suspicion or obloquy should outweigh the local interests served by an attorney's continued participation in a particular case."); *Herbert,* 292 N.J.Super. at 441, 678 A.2d at 1190; *Steel,* 912 F.Supp. at 740; *Host Marriott,* 891 F.Supp. at 1009. Given the extreme nature of disqualification and the tendency of such a remedy to undermine public confidence in the litigation process, the appearance must be "something more than a fanciful possibility"; it must have a reasonable basis in fact. *Dewey,* 109 N.J. at 216, 536 A.2d 243; *Steel,* 912 F.Supp. at 740 (quotation omitted); *Host Marriott,* 891 F.Supp. at 1009.

Defendants argue that the Magistrate Judge erred in the appearance of improprie-

ty analysis by using the incorrect irrebuttable presumption of shared confidences as the premise for determining that the public would perceive impropriety in the continued representation by all defense counsel. Defendants argue that the general public is "not interested in legal presumptions, they are interested in facts." Certain Defendants' Memorandum of Law in Support of Appeal, at 27.

Essex argues that Skadden's membership in the Joint Defense Agreement creates, on its face, an appearance of impropriety regardless of any actual transmission of confidences. Essex therefore argues that the Magistrate Judge's finding that an ordinary citizen would find defense counsel's continued representation improper was not clearly erroneous.

 In holding that an ordinary citizen would find an appearance of impropriety in defense counsel's continued representation, the Magistrate Judge relied on an irrebuttable presumption that Skadden shared confidences solely by virtue of its participation in the Joint Defense Agreement. The Magistrate Judge's ruling was not the product of a careful examination of all relevant facts and circumstances, as required by RPC 1.9(b) and controlling New Jersey case law. The Magistrate expressly declined to inquire as to the nature and extent of any disclosures made by Skadden to other defense counsel. Such a refusal prevented the Magistrate Judge from being sufficiently acquainted with the material facts to be able to ascertain whether any citizen would find an appearance of impropriety. The Court has already found that the Magistrate Judge's refusal to consider defendants' affidavits denying disclosure of confidences was contrary to law. The Court will not compound that error by endorsing the Magistrate Judge's appearance of impropriety analysis, which suffers from the same lack of factual foundation. Accordingly, the Court finds that the Magistrate Judge's application of the appearance of impropriety doctrine without considering all relevant facts was contrary to law. The Magistrate Judge's disqualification order will be reversed on this basis as well.

## Balancing of Hardships

 Because disqualification of counsel during pending litigation renders a grave disservice to the affected client, courts must closely scrutinize the facts and precisely apply precedent to avoid injustice. *See Dewey,* 109 N.J. 201 at 221, 536 A.2d 243; *Reardon,* 83 N.J. at 469, 416 A.2d 852. In so doing, the court must balance the hardships to the client whose lawyer is sought to be disqualified against the potential harm to the adversary should the attorney be permitted to proceed. *Carlyle Towers,* 944 F.Supp. at 345 ("[A] delicate balance must be maintained between 'the sacrosanct privacy of the attorney-client relationship … and the prerogative of a party to proceed with counsel of its choice.' "). In addition, the court must consider its obligation to preserve high professional standards and the integrity of the proceedings. *Dewey,* 109 N.J. at 218, 536 A.2d 243; *Steel v. General Motors Corp.,* 912 F.Supp. 724, 745 (D.N.J.1995); *Carlyle Towers,* 944 F.Supp. at 345.

Defendants argue that the Magistrate Judge failed to consider the hardship to the defendants and the practical effect of disqualification on the administration of justice. Defendants argue that even assuming, arguendo, that an actual conflict exists, the hardship to the defendants substantially outweighs any potential harm to Essex if defense counsel were permitted to proceed. Defendants further argue that disqualification of all defense counsel will have a chilling effect on the formation of joint defense groups, without serving any legitimate purpose.

Essex argues that the Magistrate Judge's consideration of the relative hardships to the parties was not clearly erroneous or contrary to law. Essex contends that the burden imposed on Essex and the threat to the integrity of the legal profession posed by defense counsel's continued representation far surpass any hardship to defendants.

The Court's review of the Magistrate Judge's May 23, 1997 Opinion and Order shows that the Magistrate Judge failed to even address the relative hardships imposed by disqualification. Nonetheless, in its Mem-

orandum of Law in Opposition to Defendants' Appeal, Essex boldly writes:

> As was evident in the May 23, 1997 decision, this delay [imposed by disqualification] and the imposition of finding new counsel was weighed against and contrasted with allowing all the defense attorneys to continue to represent their carriers.

Memorandum of Law in Opposition to Defendants' Appeal, at 20. The Court is disappointed by Essex's misrepresentation of the contents of the Magistrate Judge's opinion. Nowhere in the May 23, 1997 opinion (or order) did the Magistrate Judge ever mention the hardship his decision would impose on any party or the effect of his ruling on the integrity of the bar. The Court finds that the Magistrate Judge's failure to balance the relative hardships was contrary to law. Accordingly, the Magistrate Judge's disqualification order will be reversed on this basis as well.

### CONCLUSION

For the foregoing reasons, the Magistrate Judge's May 23, 1997 Order disqualifying defense counsel will be reversed. A hearing will be conducted to ascertain the material facts surrounding Skadden's participation in the joint defense consortium and to determine to what extent, if any, confidential information which was shared between Essex and Skadden was communicated to other defense counsel. The decision as to whether, and to what extent, any documents should be reviewed *in camera* is left to the discretion of the Magistrate Judge. An appropriate Order accompanies this Opinion.

### ORDER

For the reasons set forth in the accompanying Opinion, **IT IS** on this 28th day of January 1998 **ORDERED** that the Order of the Magistrate Judge dated May 23, 1997 is reversed. The matter will proceed to a hearing. The decision as to whether, and to what extent, any documents should be reviewed *in camera* is left to the discretion of the Magistrate Judge.